UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON WYSOGLAD<br><br>Plaintiff<br><br>v.<br><br>CARDS HOLDINGS, LLC, a Delaware limited liability company d/b/a CARDS RECYCLING, CARDS GP, LLC, a Delaware limited liability company, CARDS PARTNERSHIP HOLDINGS, L.P. a Deleware limited partnership, KINDERHOOK INDUSTRIES, a New York licensed Small Business Investment Company, SAM KEENAN, ROBERT MICHALIK, and DAN CHRISTENSEN,<br><br>Defendants. | ) | Case No.<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT**

Plaintiff BRANDON WYSOGLAD, by and through his attorneys HR LAW COUNSEL, LLC, and for his Complaint against Defendants CARDS HOLDINGS, LLC, a Delaware limited liability company d/b/a CARDS RECYCLING, CARDS GP, LLC, a Delaware limited liability company, CARDS PARTNERSHIP HOLDINGS, L.P. a Deleware limited partnership, KINDERHOOK INDUSTRIES, a New York licensed Small Business Investment Company, SAM KEENAN, ROBERT MICHALIK, and DAN CHRISTENSEN, alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action brought by Plaintiff, Brandon Wysoglad, alleging that Defendants CARDS HOLDINGS, LLC d/b/a CARDS RECYCLING, CARDS GP, LLC, CARDS PARTNERSHIP HOLDINGS, L.P., (collectively referred to as "CARDS"), KINDERHOOK INDUSTRIES ("Kinderhook"), SAM KEENAN ("Keenan"), ROBERT MICHALIK

("Michalik"), and DAN CHRISTENSEN ("Christensen") breached contracts related to compensation and employment benefits by failing to honor agreements and promises between them and Mr. Wysoglad. Plaintiff also makes a claim for promissory estoppel, fraud, breach of the implied covenant of good faith and fair dealing, conversion, defamation, fraudulent misrepresentation, Fraudulent Transfer Under 740 ILCS § 160/5, civil conspiracy, and claims under the Illinois Wage Payment and Collection Act. Relief sought by Plaintiff includes compensatory damages, punitive damages, costs, and attorney's fees.

2. This case presents a simple, all-too-common story, of a business leader with equitable control of corporate interests concocting a false basis to force out an executive in order to try and secure that forced-out executive's corporate interests at no cost for himself, claiming a complete forfeiture. Defendant Dan Christensen, in correspondence attached hereto and discussed in greater detail below, claims that he can do just that to the Chief Financial Officer that he lured away from another employer just months prior. Through August 30, 2023, the day that Defendant Christensen purported to terminate Mr. Wysoglad for "cause," Mr. Wysoglad had never received a single indication that he was underperforming. To the contrary, Mr. Wysoglad was showered with accolades throughout his employment up until the day before he was terminated. During this same period, the Defendant companies increased their equity forecasts nearly two-fold, providing Mr. Wysoglad with an estimated $6 million equity payout had he remained employed. Mr. Wysoglad was also due a severance payment equal to six months of his salary. Defendant Christensen claims that sum was also forfeited due to the "for cause" termination.

3. Mr. Wysoglad was compensated for his efforts through a combination of salary, bonuses and equitable and profits interests in the constellation of limited liability companies he served (the "Equity Interests"). His annual salary was $275,000, with a target bonus of $137,500.

Mr. Wysoglad's Equity Incentives vested over a five-year period at 20% per year. However, Defendant Christensen promised otherwise, stating that a "Qualifying Sale" would occur by the end of 2023. The "Qualifying Sale" language acts as a "trigger," providing Mr. Wysoglad full vestiture in his Equity Incentives. At the time Mr. Wysoglad was hired, Defendant Christensen benchmarked that equity value at approximately $3 million. In late August 2023, Defendant Christensen revised that number to nearly $6 million.

4. Of course, it may not have been this way; if Mr. Wysoglad had performed badly and the businesses suffered as a result, his Equity Interests could be worth a lot less or perhaps even zero. But that is the risk that all business partners and employees alike undertake when they agree to be compensated for their effort, at least in part, with equitable interests in the very businesses they are trying to grow.

5. Unfortunately, this success also reveals the motivation behind Defendant Christensen's brazen attempt to manufacture "cause" for Mr. Wysoglad's termination. Indeed, on August 29, 2023 (the day before the termination), Defendant Christensen excitedly told Mr. Wysoglad that with the completion of an additional acquisition in the upcoming two months, the various executives' equity interests would nearly double in value and marked the end of December 2023 as the likely time a "Qualifying Sale" would occur. This is why, in bad faith and without cause, Defendant Christensen immediately terminated Mr. Wysoglad. Defendant Christensen could not wait another day to manufacture the for "cause" termination because the Equity Incentive Plan had a clause that stated if a "Qualifying Sale is consummated within six (6) months of [Mr. Wysoglad's] termination date, and [Mr. Wysoglad] was terminated without Cause, then the unvested [Equity Incentives] will not be forfeited, will vest 100%, and will be deemed vested [Equity Incentives] upon such Qualifying Sale."

6. Mr. Wysoglad's employment came to a bizarre and unexpected end on August 30, 2023. There would be no last day in the office, no goodbye email to colleagues that he led, hired, trained, mentored and enjoyed great working relationships with for his short time there. Instead, Defendant Christensen simply cut Mr. Wysoglad off from the company email, intranet and office access and told him that he would receive his "severance agreement" later that day. The promised severance agreement never materialized and instead, a termination letter was sent to Mr. Wysoglad days later, purporting to terminate him for "cause" and claiming that all his Equity Interests were forfeited. Defendant Christensen claimed that the decision was made by Defendant Kinderhook and that he couldn't do anything about it.

7. Defendant Christensen's termination of Mr. Wysoglad, based upon a "cause" he concocted out of thin air, is a fraudulent and bad-faith effort to manufacture a forfeiture of Mr. Wysoglad's Equity Interests, bonus, and severance payment. Mr. Wysoglad and all of Defendants' other employees and investors alike deserved better than this dishonorable and disloyal act, which Defendant Christensen is now perpetuating through a defamatory smear campaign to try and justify his unwarranted act.

8. What happened here was wrong for many reasons and Mr. Wysoglad respectfully requests that the Court declare that his termination was wrongful and grant him a variety of relief for that wrongful act (which Defendant Christensen committed).

## PARTIES

9. Plaintiff Brandon Wysoglad is an Illinois resident and business executive who was sought out and hired by Defendants to be the Chief Financial Officer of CARDS HOLDINGS, LLC (d/b/a CARDS RECYCLING) in April 2023.

10. Defendant CARDS HOLDINGS, LLC (d/b/a CARDS RECYCLING) is a Delaware limited liability company with its principal place of business at 4208 Johnson Road, Springdale, AR 72762. CARDS RECYCLING, and its affiliates, operate hauling companies, transfer stations, recycling centers, recovery facilities and landfills throughout the Midwest.

11. Defendant CARDS GP, LLC, is a Delaware limited liability company with its principal place of business at 4208 Johnson Road, Springdale, AR 72762. CARDS GP, LLC is the general partner of CARDS PARTNERSHIP HOLDINGS, L.P.

12. Defendant CARDS PARTNERSHIP HOLDINGS, L.P., is a Delaware limited partnership with its principal place of business at 4208 Johnson Road, Springdale, AR 72762. CARDS PARTNERSHIP HOLDINGS, L.P. is the indirect parent company of CARDS HOLDINGS, LLC (d/b/a CARDS RECYCLING).

13. Upon information and belief, each of the aforementioned Defendants are part of the investment portfolio of the private equity firm Defendant KINDERHOOK INDUSTRIES, a licensed Small Business Investment Company located in New York with its principal place of business at 521 Fifth Avenue, 34th Floor, New York, N.Y. 10175.

14. SAM KEENAN is a Principal at KINDERHOOK INDUSTRIES and a resident of New York.

15. ROBERT MICHALIK is a Managing Partner at KINDERHOOK INDUSTRIES and a resident of New York.

16. DAN CHRISTENSEN is the founder and president of CARDS RECYCLING. Christensen is also the registered agent of CARDS RECYCLING with an address listed as 4208 Johnson Road, Springdale, AR 72762. Christensen is also the President of CARDS Partnership Holdings, L.P.

## JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and no plaintiff is from the same state as any defendant.

18. Venue in the United States District Court for the Northern District of Illinois is appropriate under 28 U.S.C. § 1391 because Plaintiff is located in Schaumburg, Illinois and a substantial part of the actions giving rise to the claims occurred in this District.

19. An actual case or controversy has arisen between the parties.

20. Mr. Wysoglad has been injured by Defendants' conduct and has suffered damages resulting therefrom.

## FACTUAL BACKGROUND

21. Kinderhook Industries, a private equity group, acquired CARDS RECYCLING in March 2023. According to its website, Kinderhook is a private investment firm that manages over $5 billion of committed capital and made in excess of 400 investments and follow-on acquisitions since inception.

22. CARDS RECYCLING first approached Mr. Wysoglad in March 2023 regarding its open Chief Financial Officer (CFO) position.

23. At the time, Mr. Wysoglad was the Chief Financial Officer of National Express LLC with a salary of $350,000, an annual bonus of up to $350,000, and equity grants valued at approximately $975,000. Mr. Wysoglad lived and worked in Illinois.

24. Initially, Mr. Wysoglad was concerned about a move to Arkansas. Mr. Wysoglad and his family of five live in Schaumburg, Illinois and CARDS is located in Springdale, Arkansas. As part of the negotiation process, CARDS made it clear that it wanted Mr. Wysoglad to relocate

to Arkansas and offered various house hunting and relocation incentives to entice him to take the position.

25. Mr. Wysoglad was also leery of CARDS RECYCLING's multiple CFOs that had come and gone in the two years prior to his hiring. Counting Mr. Wysoglad, CARDS has cycled through four CFOs in the last two years.

26. However, with Kinderhook's acquisition of CARDS, Mr. Wysoglad felt confident that Kinderhook would run CARDS RECYCLING in a professional manner as it did its other portfolio investments. This meant that the likelihood of sudden executive team changes was very low, especially since CARDS was already part of KINDERHOOK'S portfolio at the time of Mr. Wysoglad's hiring and had participated in CARDS' hiring decision. Indeed, Sam Keenan and Robert Michalik, were directly involved in the hiring of Mr. Wysoglad.

27. Defendant Christensen was also very persuasive, assuring Mr. Wysoglad that he was different than his prior CFOs, the CFO position was right for him, and that CARDS was willing to put its money where its mouth was.

28. Although CARDS could not match Mr. Wysoglad's salary and bonus at his ten-current employer, Defendant Christensen was willing to provide Mr. Wysoglad with a sizeable equity interest and a promise that a "Qualifying Sale" would occur before the end of the year – thus, fully vesting Mr. Wysoglad's Equity Incentives.

29. The Employment Agreement (attached hereto as Exhibit A) promised a $275,000.00/year salary, 14 days of paid time off, an annual target bonus of $137,500.00, various house hunting and relocation costs, and participation in CARDS PARTNERSHIP HOLDINGS, L.P.'s 2023 Incentive Equity Plan (attached hereto as Exhibit B).

30. It was the equity grant that ultimately incentivized Mr. Wysoglad to join CARDS. Defendants, by and through the representations made by Defendant Christensen, promised that CARDS RECYCLING would be sold by the end of 2023, that Mr. Wysoglad's leadership in addressing CARDS RECYCLING's finance and accounting needs would be important in positioning CARDS RECYCLING for sale, and that the equity cash-out for Mr. Wysoglad would easily surpass $3 million.

31. After careful and significant consideration, Mr. Wysoglad concluded that the equity incentives were rich enough to balance against the potential hardships of relocating his family to Arkansas and accepting a lesser salary and bonus.

32. Specifically, Mr. Wysoglad was reassured by two specific guarantees within the contracts: (1) a clause that provided for six months of severance (or $137,500.00) if he was terminated without cause; and (2) a savings clause in the equity grant documentation that provided "if a Qualifying Sale is consummated within six (6) months of the Grantee Termination Date, and Grantee was terminated without Cause, then the Unvested [] Incentive Units will not be forfeited, will vest 100%, and will be deemed Vested [] Incentive Units upon such Qualifying Sale."

33. Defendants' specific and repeated promises and representations regarding the substantial value of Mr. Wysoglad's equity interest in CARDS RECYCLING and the upcoming Qualifying Sale, made with the intention and expectation that Mr. Wysoglad would rely on those representations, was the deciding factor in Mr. Wysoglad's decision to join CARDS. Defendants were aware of and encouraged Mr. Wysoglad's reliance upon these promises and representations.

34. In or around April 4, 2023, Defendants hired Mr. Wysoglad to serve as CARDS RECYCLING'S Chief Financial Officer.

35. To perform his duties at CARDS, Mr. Wysoglad began preparations to move to Arkansas. Mr. Wysoglad and his wife began preparing their three children for the move and the upcoming change in schools. In the meantime, Mr. Wysoglad was traveling weekly to Arkansas, spending weekdays there and commuting back to Schaumburg, Illinois when able.

36. Mr. Wysoglad reported directly to and received orders and directions from Christensen as well as the Board members of CARDS PARTNERSHIP HOLDINGS, L.P.

37. Mr. Wysoglad believed the relationship to be a positive one. CARDS and Kinderhook consistently praised Mr. Wysoglad's work.

38. During the Summer of 2023, Mr. Wysoglad was reassured countless times by Defendant Christensen that CARDS RECYCLING would realize a considerable profit and that within 3-6 months, the work put in would prove worthwhile for Mr. Wysoglad and the entire CARDS executive team pursuant to the equity and performance bonus programs.

39. On August 22, 2023, in Mr. Wysoglad's office, Defendant Christensen and Mr. Wysoglad updated the CARDS equity model to determine what the estimated payout would be with the "LRS South Region" deal. Defendant Christensen stated that he wanted to personally illustrate what the equity payouts would be and repeatedly provided Mr. Wysoglad with enthusiastic support.

40. The updated model included the following assumptions: Kinderhook incremental investment preferred units of $60m, $50m in adjusted EBITDA, 15.0x exit multiple, Net Debt of $210m, and an exit date of 12/2023. This resulted in management incentive equity proceeds of $49m with the CFO's proceeds estimated at $6.7m (almost double the initial number promised by Defendant Christensen).

41. On August 29, 2023, Defendant Christensen attended a weekly call to get caught up on how the implementation of CARDS' new financial system (Sage Intacct) was progressing. The service provider indicated that the team was ahead of schedule and was planning to "go live" with the new system in October 2023 -- the same date that was presented to the Board on July 18, 2023.

42. That same day, during the weekly state of the union (SOTU) meeting with the CARDS executive team (CEO/CRO/COO/CFO), Defendant Christensen kicked off the meeting by walking through the LRS South Region deal and was "100% confident" that the deal would transact by the end of the year.

43. During that same meeting, the executive team discussed strategic locations, key assets, and synergies in preparation for integration planning. Both Defendant Christensen and CARDS RECYCLING's CRO were outwardly excited about the deal for both professional and personal reasons. Each man had worked at LRS previously and had unfavorable experiences. They relished the idea of acquiring the company.

44. The very next day, August 30, 2023, Mr. Wysoglad attended the weekly status meeting in Defendant Christensen's office.

45. At this meeting on August 30, 2023, Mr. Wysoglad was summarily terminated by Defendants.

46. Defendant Christensen indicated it wasn't "working out" and that he "needed to move on." He also conceded that CARDS provided no warning to Mr. Wysoglad about this decision. Not once did Defendant Christensen indicate that the termination was related to Mr. Wysoglad's performance.

47. Mr. Wysoglad was flabbergasted at the decision to fire him. This was especially true given his constant participation in meetings and decisions that were related to the future of the company and the accolades he regularly received for his work.

48. Defendant Christensen admitted to "over selling" the role and "over-promising" to Mr. Wysoglad.

49. Defendant Christensen then asked Mr. Wysoglad what type of role/skillset he should be looking for to replace Mr. Wysoglad. Mr. Wysoglad was beside himself at the cavalier nature and tone of Defendant Christensen's remarks.

50. Mr. Wysoglad then asked Defendant Christensen if there was a separation agreement to review.

51. Defendant Christensen indicated that Akin Gump (a law firm) was working on an agreement and that it would be available later that afternoon.

52. Defendant Christensen then told Mr. Wysoglad that he could leave, thanked him for his time, mentioned he wanted to continue their "friendship," and gave him a handshake.

53. Defendant Christensen provided no rationale for the decision to fire Mr. Wysoglad and, again, made no mention of performance issues. In fact, Defendant Christensen again complimented Mr. Wysoglad on his work and thanked him.

54. Mr. Wysoglad then proceeded to his office, packed his things, and left the building.

55. On September 1, 2023, having not received a separation agreement, Mr. Wysoglad e-mailed Defendant Christensen asking when he would receive it. Defendant Christensen responded, stating that "I brought the separation papers to your office just a few minutes after our discussion, but I had already missed you. We'll cut a check today for the reimbursement and I'll send you the termination letter by separate email."

56. Mr. Wysoglad was confused by the e-mail as to why Defendant Christensen would be sending a "termination letter" via separate e-mail as opposed to the separation agreement that was promised on the afternoon of August 30, 2023.

57. The termination letter stated that Mr. Wysoglad was terminated "for cause" and listed a litany of reasons for the termination that were wholly inconsistent with Mr. Wysoglad's actual performance as CFO. The letter also made clear that Mr. Wysoglad would not receive a severance payment and that his equity grants were terminated.

58. Floored by the letter, Mr. Wysoglad called Defendant Christensen. Defendant Christensen indicated that Akin Gump and Kinderhook "made him" send the termination letter. Defendant Christensen had no explanation of the "for cause" language in the letter and indicated that he would "work on them" – which Mr. Wysoglad took as Defendant Christensen making efforts to change the nature of the termination. Defendant Christensen stated that he would discuss the contents of the employment agreement with Akin Gump and Kinderhook on Tuesday, September 5, 2023, and get back to Mr. Wysoglad.

59. On September 6, 2023, Defendant Christensen called Mr. Wysoglad, stating that there would be no separation agreement and indicating that the decision to terminate for "cause" came from Akin Gump and Kinderhook. Defendant Christensen further stated that their stance was not changing and there was nothing [Defendant Christensen] could do about it.

**Defendants' Termination of Mr. Wysoglad Was Based Upon Premises That Were Knowingly False and Was Done in Bad Faith**

60. The termination letter (dated August 30, 2023, and attached hereto as Exhibit C) listed the following reasons for Mr. Wysoglad's "for cause" termination:

> Your termination is pursuant to Sections 4(d)(iv), (v), (vi) and (vii) of the Employment Agreement, based on, among other things, (A) your failure to move to Arkansas in the agreed timeframe, (B) your consistent failure to perform your duties during normal business hours from the Company's Fayetteville location, (C) your repeated failure to respond to communications from the board of directors of the Company's indirect parent company, CARDS Partnership Holdings, L.P. (the "Board"), (D) your repeated failure to perform tasks assigned to you by the Board and its members, and (E) your consistent failure to perform tasks and activities customarily associated with your role in a diligent, businesslike and efficient manner, including your failure to (I) complete assigned tasks generally, (II) meet reasonable required deadlines, and (III) produce work-product free from significant errors, omissions and inaccuracies. For the avoidance of doubt, this termination also constitutes a termination for Cause for purposes of your Grant Agreement under the 2023 Incentive Equity Plan (the "Grant Agreement").

61. Mr. Wysoglad at all relevant times performed his obligations consistent with the material terms of the applicable agreements to which he was a party and denies each and every aforementioned reason for his "for cause" termination.

62. Mr. Wysoglad was a limited partner in CARDS to which he had an Award or Profits Interest. Mr. Wysoglad stood ready, willing and able to perform all of his obligations to Defendants up until Defendant Christensen wrongly terminated him.

63. The "cause" Defendant Christensen purported to identify in the August 30, 2023, termination letter is completely false.

64. Defendants did not simply manufacture a single rationale for the "for cause" determination. Rather, like a child filling in a Mad Libs word puzzle, Defendants listed rationales for every "for cause" clause in the Employment Agreement that was not grossly inapplicable (such as the commission of a felony, embezzlement, etc.). Each and every item listed in the "for cause" section of the Termination Letter is patently false, manufactured in bad faith, and intentionally damaging to Mr. Wysoglad's professional reputation.

65. First, Defendants claim that Mr. Wysoglad failed to "move to Arkansas in the agreed time frame." Setting aside that this "agreed time frame" appears nowhere in any of the applicable Agreements, this manufactured rationale for "cause" is in blatant bad faith.

66. Mr. Wysoglad repeatedly and consistently spoke with Defendant Christensen about his plans to move to Arkansas and had his full support regarding those plans. The two men agreed early on that Mr. Wysoglad would follow Defendant Christensen's example when he [Christensen] decided to relocate to Arkansas: commute for a time; find an apartment with room for the family to visit and learn about schools, sports, social activities and the like; and then make the move at a sensible time based on school schedules and the housing markets.

67. Indeed, Mr. Wysoglad found an apartment and was ready to sign the lease on August 29, 2023. Mr. Wysoglad told Defendant Christensen about the news and was greeted with full-throated support. To be crystal clear, Defendant Christensen encouraged Mr. Wysoglad to sign the lease the day before he terminated him.

68. Defendants' reliance on this alleged "for cause" factor is knowingly and purposefully dishonest and made in bad faith.

69. Second, Defendants claim that Mr. Wysoglad consistently failed to perform his duties "during normal business hours from the Company's Fayetteville location." Setting aside that this requirement is wholly absent from any of the applicable agreements, the statement is simply nonsense.

70. Mr. Wysoglad lives in Schaumburg, Illinois and commuted to the Fayetteville office every week. Initially, for the first month and a half of his employment, Mr. Wysoglad was taking the first flight out of Chicago on Monday morning, arriving at the office around 10:00 a.m. He would then take the flight home on Friday (mid-morning), arriving in Chicago around 1:00 p.m.

71. Like any professional and seasoned executive, Mr. Wysoglad worked nights, weekends, mornings, on the plane, in airports, etc.

72. Mr. Wysoglad's weekly commute and long hours were in stark contrast to how other out-of-state executives governed themselves. CARDS' Chief Revenue Officer (CRO), Dustin Reynolds, lives in Wisconsin and would commute to the Fayetteville office every other week. Put another way, CARDS' CRO worked half the month out-of-state. Nevertheless, Mr. Wysoglad changed his commute at the end of June 2023 so that he would stay at the office until after 5:00 p.m. on Fridays and take a flight home that would have him arriving at his house at 10:00 p.m.

73. Defendants' reliance on this alleged "for cause" factor is knowingly and purposefully dishonest and made in bad faith.

74. Third, Defendants claim that Mr. Wysoglad repeatedly failed to respond to communications from the Board of Directors of the Company's indirect parent company, CARDS Partnership Holdings, L.P. (the "Board"). This statement is blatantly false, made in bad faith, and contradicted by various facts more fully explained below in paragraphs 75-82.

75. Defendants will be unable to produce a single example of this alleged "for cause" rationale. Mr. Wysoglad responded to every request made by the Board – unless, of course, Defendant Christensen (who is a member of the Board) countermanded it.

76. Fourth, Defendants claim that Mr. Wysoglad repeatedly failed to perform tasks assigned to him by the Board and its members. This statement is also blatantly false, made in bad faith, and contradicted by various facts more fully explained below in paragraphs 75-82.

77. Finally, Defendants claim that Mr. Wysoglad "consistent[ly] fail[ed] to perform tasks and activities customarily associated with your role in a diligent, businesslike and efficient manner, including [his] failure to: (I) complete assigned tasks generally, (II) meet reasonable required deadlines, and (III) produce work-product free from significant errors, omissions and

inaccuracies." This statement is blatantly false, made in bad faith, and contradicted by various facts more fully explained below in paragraphs 75-82.

78. Mr. Wysoglad was constantly praised for his work ethic, deliverables, timeliness, and professional insight.

79. For example, on July 18th, 2023, at the end of the Q2 Board meeting, a Kinderhook partner (Rob Michalik) complimented Mr. Wysoglad and the CARDS team on the Board presentation and the accomplishments achieved to date. It was Mr. Wysoglad who had full responsibility for the presentation that was submitted in advance of the Board meeting and Defendant Christensen and the CARDS management team similarly complimented Mr. Wysoglad on the matter.

80. Of particular praise were Mr. Wysoglad's accomplishments in Finance, Accounting and IT including: (1) a signed statement of work for a new financial system (Sage Intacct) that resulted in annual savings of $90k+; and (2) the successful build of an "In-house" IT team from an outsourced solution that was in place, resulting in annual cost savings of $50k+ and allowing CARDS to keep up with its aggressive acquisition integration plan.

81. In another instance, a week before his termination, Mr. Wysoglad built a forecast model by division overnight (per Defendant Christensen's request) and held a meeting with the leadership team (CEO/CFO/COO/CRO/Controller) the following morning at 8:00 a.m. to walk through the materials in detail. During that meeting, Defendant Christensen complimented Mr. Wysoglad several times on how well the model was pulled together (including solid assumptions that Defendant Christensen could not poke holes through) and couldn't believe this was achieved "overnight."

82. Mr. Wysoglad can (and will through this litigation) produce countless examples of praise regarding his responsiveness, work product, effectiveness, professionalism, and expertise that flatly contradicts the false accusations and disingenuous representations in the Termination Letter.

83. However, perhaps most demonstrative of Defendants' bad faith in terminating Mr. Wysoglad "for cause" is there repeated and consistent praise and marketing of Mr. Wysoglad.

84. CARDS marketed Mr. Wysoglad anywhere and everywhere. Defendants were constantly advertising their acquisition of Mr. Wysoglad (a "big time" CFO") on: calls and in person with potential investors (JP Morgan Chase/Fifth Third Bank/BOK Financial); the CARDS Recycling website; external news/press (regarding acquisitions); Facebook; external auditors (Deloitte); and elsewhere:

a. Facebook (6/30/23):



b. Press Releases:

(Wastedive.com - 7/11/23):[1]




**FAYETTEVILLE, Ark. — CARDS Recycling (CARDS)** announced the signing of yet another purchase agreement on June 26, 2023, to acquire the assets of County Recycling Services, LLC (CRS). Deal terms were not disclosed. This is CARDS' 3rd acquisition in the Dallas metro market and bolt-on to its Anna, TX operation. Reed Sanitation was purchased in 2022 and Barnes Waste Disposal closed in May of 2023. This strategic purchase looks to further densify CARDS' subscription residential and commercial presence. CRS is a solid waste collection company located in Royse City, TX which services both Rockwall and Hunt counties. Primary service offerings include subscription residential, commercial, bulky waste and temporary roll off collection. "We are excited about this acquisition," said Dan Christensen CEO of CARDS Recycling. "We've had our eyes on this opportunity for a while, we know we are tucking in a well-run company that provides immense value. Not only will we be able to grow our existing services and increase density, but we look forward to the permanent and recurring revenue stream that this brings. We've developed a significant appreciation for the CRS team given their strong commitment to delivering excellent service to their customers." This marks CARDS' 7th acquisition in 2023. With a little less than half the year left, CARDS forecasts closing 7-10 additional transactions finishing the year between 15-20 total deals in 2023. "The growth has been impressive to witness", says Brandon Wysoglad, CFO for CARDS. "As a former finance executive and change management specialist, I'm so excited to be a part of the future transformational goals we are on the path to achieve." Brandon joined the CARDS team in April of 2023 from National Express LLC, where he most recently served as CFO of the North American subsidiary of Mobico Group, one of the premier transportation firms in the United Kingdom.

[1] https://www.wastedive.com/press-release/20230711-cards-recycling-makes-3rd-acquisition-in-dallas-metro-market-with-county-re/ (visited 10/13/23).

(recyclingtoday.com – 6/26/23):[2]

## Cards buys County Recycling Services

This marks the company's third acquisition in the Dallas metro area since 2022.




Photo by Garrett Graham Photography

POSTED BY DEANNE TOTO | JUNE 26, 2023

Cards Recycling, headquartered in Arkansas, signed a purchase agreement June 26 to acquire the assets of County Recycling Services LLC (CRS) of Royse City, Texas, marking its third acquisition in the Dallas metro market and bolt-on purchase to its Anna, Texas operation. Terms of the deal were not disclosed.

Cards purchased Reed Sanitation in 2022 and Barnes Waste Disposal in May of this year. This strategic purchase of CRS will further densify CARDS' subscription residential and commercial presence, according to the company.




SPONSORED CONTENT

**Streamline Separation with GK's DE-STONER®**

The General Kinematics DE-STONER® Air Classifier incorporates vibration, fluidization, and classification to provide you with optimized density separation. Available in two to five fraction separation models, the DE-STONER® can separate a wide range of materials efficiently and consistently. Optimize your recycling classification system today with the DE-STONER®!

CRS serves Rockwall and Hunt counties and provides subscription residential, commercial, bulky waste and temporary roll-off collection.

"We are excited about this acquisition," Cards Recycling CEO Dan Christensen says. "We've had our eyes on this opportunity for a while; we know we are tucking in a well-run company that provides immense value. Not only will we be able to grow our existing services and increase density, but we look forward to the permanent and recurring revenue stream that this brings. We've developed a significant appreciation for the CRS team given their strong commitment to delivering excellent service to their customers."

The CRS acquisition is the company's seventh this year. With a little less than half the year left, Cards says it forecasts closing seven to 10 additional transactions, finishing the year with a total of between 15 to 20 total deals.

"The growth has been impressive to witness," Cards Chief Financial Officer (CFO) Brandon Wysoglad says. "As a former finance executive and change management specialist, I'm so excited to be a part of the future transformational goals we are on the path to achieve."

Wysoglad joined the company in April from National Express LLC, where he most recently served as CFO of the North American subsidiary of Mobico Group, one of the premier transportation firms in the United Kingdom.

Cards Recycling is a leading regional provider of solid waste hauling, transfer and disposals services. It offers residential, commercial, roll-off, portable restroom, recycling and disposal services for homes, businesses and contractors. Its platform consists of owned hauling facilities, transfer stations, recycling centers and landfills.

[2] Appearing three times (including on CARDS' website): https://www.recyclingtoday.com/news/cards-buys-county-recycling-services-texas/ (visited 10/13/23); https://cardsrecycling.com/cards-recycling-makes-3rd-acquisition-in-dallas-metro-market-with-county-recycling-services/ (visited 10/13/23); https://www.wastetodaymagazine.com/news/cards-buys-county-recycling-services-texas/(visited 10/13/23).

85. Perhaps most telling is that as of September 21, 2023, Mr. Wysoglad is still listed on the CARDS' website under "Leadership Team:"




These activities do not reflect those of a Company who has fired their CFO "for cause" for a half a dozen reasons.

**Defendant Christensen's Lack of Transparency and Misrepresentations**

86. Upon information and belief, one of the reasons why Defendant Christensen so quickly changed his tune on Mr. Wysoglad has to do with how he runs his business, the lack of transparency with Kinderhook, and his intermingling of assets throughout several entities. The only other person who could keep Defendant Christensen "honest" was Mr. Wysoglad.

87. Defendant Christensen was responsible for recognizing the various "synergies" that he claimed would appear after CARDS' various acquisitions over the last six months. As of August 2023, CARDS had acquired nine entities in 2023 and over twenty entities over the last four years.

88. When Kinderhook purchased the CARDS entities, it was promised quick cost savings through the integration of the various systems and personnel present within the various entities acquired by CARDS. Direct labor, repairs/maintenance, and SG&A (selling, general, and

administrative) expenses were the largest gaps to plan CARDS carried. The synergies between the various CARDS entities were supposed to reduce these expenditures.

89. To recognize that goal, almost immediately after hiring Mr. Wysoglad, Defendant Christensen tasked him with implementing various layoffs across the CARDS' entities. While Mr. Wysoglad implemented the layoffs, it was Defendant Christensen who had sole responsibility for selecting the employees that he deemed redundant.

90. However, those synergies were not being recognized in the financials. To the contrary, the CARDS entities were stressed post-layoffs and barely recognized a cost savings in July 2023.

91. In August 2023, the gap between CARDS' projected performance and actual performance was still increasing with CARDS being significantly over plan.

92. In addition to a lack of transparency with Kinderhook regarding the financials, Defendant Christensen was also shedding personnel that knew more than he wished they knew about how he ran the business, including but not limited to: IT Support (9/14/23); Defendant Christensen's executive assistant (8/23); CARDS' Staff Accountant (8/23); CARDS' Operations/Billing System Administrator (8/23); and of course, Mr. Wysoglad.

93. Of note are the finance and accounting terminations. For example, Defendant Christensen insisted that Mr. Wysoglad terminate the Operations/Billing System Administrator two days prior to his own termination. The Operations/Billing System Administrator was responsible for integrating the billing of CARDS' recent acquisitions into the CARDS system (Soft-Pak). She was also the only employee with administrative rights to the billing system. When Mr. Wysoglad questioned how CARDS would function without the only employee with this system expertise and billing knowledge, Defendant Christensen told him that he [Christensen]

could do it. By the end of August, Defendant Christensen had terminated the employees closest to CARDS' financial difficulties, providing him with the ability to shape the numbers presented to Kinderhook as he wished.

94. Upon information and belief, these departures are only the most recent from a series of roughly fifteen CARDS' employees and members whom Defendant Christensen has terminated or whom have otherwise left CARDS under disputed circumstances since 2019.

95. These departures also allowed CARDS to temporarily and immediately close the gap between its projected forecasts and its actual performance as presented to Kinderhook. However, it was a short-term "fix" for a long-term problem.

96. These targeted departures also provided Defendant Christensen with more opportunities to shape the numbers relating to his businesses and activities outside and inside the CARDS entities. According to Secretary of State records, Defendant Christensen is the owner and/or officer of more than ten separate entities. Upon information and belief, Defendant Christensen has these entities working with and for each other as needed to inflate CARDS' performance when reporting to Kinderhook.

97. For example, Defendant Christensen's hauling & logistics business resides outside of CARDS Holdings; however, Defendant Christensen uses assets from this entity to favorably benefit the financials for the Springdale Transfer Station, a location that resides within the CARDS Holdings entity structure. Without the influx of assets, the Springdale Transfer Station would clearly be losing money than it already is.

98. Upon information and belief, there is also reason to question Defendant Christensen's recent hiring of a pilot at $100,000 a year to be on call to fly him on his recently purchased $3 million King Air turboprop plane.

**Defendants Conclude their Scheme to the Detriment of Mr. Wysoglad**

99. Mr. Wysoglad joined CARDS as its CFO in reliance upon Defendants' promises that Mr. Wysoglad would reasonably participate in all of the increased equity value of the business during his tenure and pursuant to the Employment and Incentive Equity Agreements.

100. Defendants had a duty to refrain from negligently and/or intentionally making false, inaccurate, or misleading representations to Mr. Wysoglad.

101. At no time prior to the commencement of Plaintiff's employment with CARDS did Defendants indicate to Plaintiff that they would not fulfill the promises made to induce Plaintiff to join CARDS. To the contrary, Defendant Christensen made it a point to repeatedly reenforce and inflate his promises made to Mr. Wysoglad up to the day prior to Defendant Christensen's bad faith termination of Mr. Wysoglad.

102. Accordingly, Mr. Wysoglad's reliance upon Defendants' promises and representations was reasonable under the circumstances.

103. As a direct and proximate result of Defendants' misrepresentations, inducements, and broken promises, Mr. Wysoglad suffered significant personal and professional damage and was deprived of any benefit based on the equity and performance-based bonus programs.

104. Moreover, Mr. Wysoglad's reputation within his chosen profession has been decimated by Defendants' capricious and inequitable conduct. A well-respected and sought-after chief financial executive now must reenter the job market and explain why he was fired from CARDS, let alone fired "for cause."

105. Defendants benefited because of Mr. Wysoglad's employment as CFO of CARDS RECYCLING and the resulting increase in the company's value and/or the company's attractiveness for acquisition, sale, or merger.

106. Defendants further benefited because of Plaintiff's employment as CFO of CARDS RECYCLING due to his ability to quickly "turn-around" the company's financials and "right the ship" – something Kinderhook stressed to him at the time of his hiring.

107. In dealing with Plaintiff with respect to his employment and compensation, both initially and during Plaintiff's tenure, Defendants purposefully, knowingly, and/or recklessly, made promises and representations described above which they knew or should have known were untrue or which the Defendants would not fulfill in order to induce and cause Plaintiff to join CARDS and, at various times, continue his employment -- all for Defendants' pecuniary benefit.

**COUNT I**
**DECLARATORY JUDGMENT**
(Against All Defendants)

108. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

109. There is an actual and present controversy among the parties regarding whether (a) there was "Cause" warranting the termination of Mr. Wysoglad as that term is defined in the various applicable agreements, (b) Mr. Wysoglad's Equity Interests may legally be forfeited pursuant to the various agreements governing the Defendants and/or Delaware law, and (c) Defendants' obligations to compensate Mr. Wysoglad under the various provisions of the applicable agreements. Plaintiff is permitted to seek this relief pursuant to Delaware law, including 6 Del. C. 18-111.

110. Defendants falsely and in bad faith contend that "Cause" existed to terminate Mr. Wysoglad, that his Equity Interests may be forfeited, and that they have no obligation to compensate Mr. Wysoglad under the terms of the applicable agreements. Mr. Wysoglad disagrees with each of these points.

111. A declaration by the Court resolving some or all of these disputes will resolve some or all of the controversy among the parties.

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

A. That the Court declare that there was no cause sufficient to terminate Mr. Wysoglad for "Cause" as defined in the various applicable agreements;

B. That the Court declare that Defendants undertook the termination of Mr. Wysoglad based upon false pretenses and in bad faith;

C. That the Court declare that Mr. Wysoglad Equity Interests were not, and may not be, forfeited under the circumstances here;

D. That the Court declare that Defendants' actions violated the terms of the applicable agreements;

E. That the Court declare that Defendants owe Mr. Wysoglad all salary and bonus which has not been paid to him since he was wrongfully terminated;

F. That the Court declare that Defendants owe Mr. Wysoglad all compensation and wages which has not been paid to him pursuant to the applicable agreements;

G. Award all costs of this suit; and

H. That the Court grant other relief as may be equitable, just and necessary.

**COUNT II**
**BREACH OF CONTRACT**
(Against All Defendants)

112. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

113. Each of the applicable agreements governing the relationships between Defendants and Plaintiff represent valid contracts that are enforceable against Defendants by Plaintiff.

114. At all times, Mr. Wysoglad performed all of his material obligations thereunder and stood ready, willing and able to continue doing so.

115. Defendant Christensen and the other Defendants materially breached these agreements in purporting to terminate Mr. Wysoglad for "Cause," when, in fact, no "Cause" existed.

116. Defendant Christensen and the other Defendants' action in terminating Mr. Wysoglad was done in bad faith and to enrich Defendant Christensen, and/or interests for which he is the majority owner or beneficiary.

117. Defendants' material breaches have actually and proximately caused Plaintiff to suffer damages including but not limited to (i) lost salary and bonus, (ii) lost severance, and (iii) lost Equity Interests.

118. None of the applicable agreements justified or permitted Mr. Wysoglad to be wrongfully terminated. No applicable law permitted Defendants to undertake these actions. By wrongly removing Mr. Wysoglad, Defendant Christensen and the other Defendants have wrongfully forfeited Plaintiff's Equity Interests, severance pay, salary and bonus, and breached all of the applicable agreements and Delaware law by doing so.

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants as follows:

A. Find that there was no cause sufficient to terminate Mr. Wysoglad for "Cause" as defined in the various applicable agreements;

B. Find that Defendants undertook the termination of Mr. Wysoglad based upon false pretenses and in bad faith;

C. Find that Mr. Wysoglad's Equity Interests, severance pay, salary and bonus were not, and may not be, forfeited;

D. Award Mr. Wysoglad his Equity Interests, severance pay, salary and bonus;

E. Award all costs of this suit; and

F. That the Court grant other relief as may be equitable, just and necessary.

**COUNT III**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
(Against All Defendants)

119. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

120. Each of the applicable agreements obligate Defendants to provide Mr. Wysoglad with certain compensation and other benefits of his employment with them.

121. Each of the applicable agreements governing the relationships between Defendants and Plaintiff represent valid contracts that are enforceable against Defendants by Plaintiff.

122. At all times, Mr. Wysoglad performed all of his material obligations under the applicable agreements and of his employment with Defendants and stood ready, willing and able to continue doing so.

123. There is implied in every contract, including the applicable agreements, a covenant of good faith and fair dealing.

124. Where an employer's termination of an employee violates public policy or where the employer falsified or manipulated employment records to create fictitious grounds for termination, that employer has breached the implied covenant of good faith and fair dealing.

125. Defendants breached the implied covenant of good faith and fair dealing when they, *inter alia*, terminated Mr. Wysoglad for “Cause,” when, in fact, no “Cause” existed.

126. Defendants' action in terminating Mr. Wysoglad was done in bad faith and to enrich Defendant Christensen and the other Defendants.

127. Defendants' material breaches have actually and proximately caused Plaintiff to suffer damages including but not limited to (i) lost salary and bonus, (ii) lost severance, and (iii) lost Equity Interests.

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

A. Find that there was no cause sufficient to terminate Mr. Wysoglad for "Cause" as defined in the various applicable agreements;

B. That Defendants breached the implied covenant of good faith and fair dealing;

C. Find that Defendants undertook the termination of Mr. Wysoglad based upon false pretenses and in bad faith;

D. Find that Mr. Wysoglad's Equity Interests, severance pay, salary and bonus were not, and may not be, forfeited;

E. Award Mr. Wysoglad his Equity Interests, severance pay, salary and bonus;

F. Award all costs of this suit; and

G. That the Court grant other relief as may be equitable, just and necessary.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
(Against Christensen, Cards Partnership Holdings, L.P.,
Keenan, Michalik, and Kinderhook Industries)

128. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

129. It is a breach of fiduciary duty under Delaware law for Defendant Christensen and the other Defendants, who owed fiduciary duties to Plaintiff, to remove a member in bad faith, and to claim that such member's Equity Interests are forfeited, in order to advance their personal interests (even if such actions were in technical compliance with the applicable agreements, which the actions complained of herein were not).

130. At all relevant times, Defendant Christensen was the majority interest holder and/or manager and final decision maker for each of the Defendants.

131. Defendant Christensen and the other Defendants owed Plaintiff fiduciary duties, including duties of loyalty, pursuant to which they are required to refrain from acting in their own self-interest and must treat Plaintiff with the utmost good faith and loyalty.

132. Defendant Christensen and the other Defendants should not have engaged in any activity or conduct which would result in a breach of those duties or inure to their personal benefit and to the detriment of Plaintiff.

133. In violation of Delaware law, Defendant Christensen and the other Defendants breached their duties to Plaintiff when they engaged in the conduct described in this complaint.

134. These actions were taken in Defendants' own self-interests, and in bad faith towards Plaintiff, with a willful, wanton, and malicious motive, all to the detriment of Plaintiff and to their own self-serving advantage.

135. As a direct and proximate result of these breaches, Plaintiff has suffered damages including but not limited to (i) lost salary and bonus, (ii) lost severance, and (iii) lost Equity Interests.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and enter a Judgment granting Plaintiff the following relief:

A. Find that there was no cause sufficient to terminate Mr. Wysoglad for "Cause" as defined in the various applicable agreements;

B. Find that Defendant Christensen and the other Defendants undertook the termination of Mr. Wysoglad based upon false pretenses and in bad faith and in their own self-interests;

C. Find that Mr. Wysoglad's Equity Interests, severance pay, salary and bonus were not, and may not be, forfeited;

D. Award Mr. Wysoglad his Equity Interests, severance pay, salary and bonus;

E. Award all costs of this suit; and

F. That the Court grant other relief as may be equitable, just and necessary.

**COUNT V**
**ILLINOIS WAGE PAYMENT AND COLLECTION ACT**
(Against All Defendants)

136. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

137. The Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 to 115/14 applies to all employers and employees in Illinois.

138. Under the IWPCA, options to acquire equity, and actual equitable interests, paid to employees as compensation, are considered "wages" under the Act.

139. Under the IWPCA, final compensation, severance payments, and bonuses paid to employees as compensation, are considered "wages" under the Act.

140. Each of Defendants are considered "employers" under the IWPCA.

141. Mr. Wysoglad was an employee of Defendants pursuant to the IWPCA.

142. The IWPCA renders Defendant Christensen personally jointly and severally liable for violations of the act. 820 ILCS 115/14. Defendant Christensen is and was personally aware of all of the matters alleged in this count, and has knowingly permitted the act to be violated including because he personally did it.

143. Mr. Wysoglad had an enforceable agreement pursuant to the IWPCA with the Defendants, as manifested in the applicable agreements, that his employment would not be terminated with "Cause" unless specific conditions were met.

144. At all times, Mr. Wysoglad performed all of his material obligations under the applicable agreements and of his employment with Defendants and stood ready, willing and able to continue doing so. The conditions for a termination with "Cause" were not met.

145. Defendant Christensen and the other Defendants violated enforceable agreements when they purported to terminate Mr. Wysoglad's employment with "Cause," and in bad faith. The IWPCA does not permit Defendants to compel Mr. Wysoglad to return wages that were paid to him. Defendants' claims of forfeiture amounts to just that, and thus violates the IWPCA.

146. Pursuant to the IWPCA, as of the date of this Complaint, Mr. Wysoglad is entitled to his salary, bonuses, and Equity Interests as unpaid wages and final compensation. Alternatively, Mr. Wysoglad is entitled to damages under the IWPCA.

147. Defendants' failure to pay Mr. Wysoglad his earned wages is a violation of the IWPCA, as is their failure to pay Mr. Wysoglad his final compensation on the day of his wrongful termination.

148. The IWCPA entitles Mr. Smith to a five percent (5%) increase in damages for each month the unpaid wages remain unpaid. 820 ILCS 115/14(a).

149. The IWCPA also entitles Mr. Wysoglad to recover costs and attorney's fees expended in connection with recovering his unpaid earned wages. 820 ILCS 115/14(a).

**WHEREFORE** Plaintiff respectfully prays that this Court enter judgment against the Defendants for:

A. His unpaid earned wages (including salary, bonuses and severance), plus 5% additional for each month the wages go unpaid prior to judgment;

B. costs and attorney's fees;

C. Find that there was no cause sufficient to terminate Mr. Wysoglad for "Cause" as defined in the various applicable agreements;

D. Find that Defendants undertook the termination of Mr. Wysoglad based upon false pretenses and in bad faith;

E. Find that Mr. Wysoglad's Equity Interests were not, and may not be, forfeited; and

F. That the Court grant other relief as may be equitable, just and necessary.

**COUNT VI**
**DEFAMATION**
(Against Defendant Christensen)

150. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

151. On or about September 1, 2023, Mr. Wysoglad learned that Defendant Christensen made statements regarding Mr. Wysoglad's termination, and that said statements were directed to employees of one or more of the other Defendants as well as the Board.

152. Specifically, Mr. Wysoglad learned that, during the past two weeks, Defendant Christensen had represented to CARDS' business partners, employees of one or more of the other Defendants as well as the Board that Mr. Wysoglad was terminated for "cause," because of Mr. Wysoglad's poor performance and that said poor performance was caused by Mr. Wysoglad's mismanagement and inability to professionally perform in his role.

153. These statements are false, as the true reason why Defendant Christensen terminated Mr. Wysoglad's employment was to deprive Mr. Wysoglad of his contractual benefits and to enrich Defendant Christensen and the other Defendants.

154. Mr. Wysoglad learned of Defendant Christensen's false statements from several people including a third party who is not employed by Defendants. Upon information and belief, the false statements made by Defendant Christensen were published to the third party by employees of the other Defendants, between the last week of August 2023 and the date of the filing of this Complaint.

155. Defendant Christensen's statements are defamatory *per se* because they falsely impute a lack of ability by Mr. Wysoglad in his profession. Specifically, these statements convey the idea that Mr. Wysoglad mismanaged the businesses he was responsible for when he was employed by Defendants. Moreover, these statements falsely claim that Mr. Wysoglad was terminated from Defendants due to poor performance and mismanagement, when in fact the true reason for Mr. Wysoglad's termination was to deprive him of his salary and bonus, severance payments, and lost Equity Interests.

156. The Defamatory statements contained factual statements, in that: (a) the specific language at issue (i.e. statements that Mr. Wysoglad was fired for "cause" due to poor performance and mismanagement) have precise meanings which are readily understood; (b) the defamatory statements are capable of being proven true or false; and (c) the full context of the defamatory statements in which they appear in the broader social context and surrounding circumstances are such as to communicate to the recipients of these statements that what was read is not opinion, but a statement of fact.

157. The defamatory statements both greatly harmed Mr. Wysoglad's reputation and prejudiced him in his trade and business. Moreover, the defamatory statements lowered Mr. Wysoglad's reputation in the eyes of the community and, upon information and belief, deterred the community from associating with Mr. Wysoglad. Therefore, damages are presumed.

158. Defendant Christensen acted with malice and made the defamatory statements for the purpose of harming Mr. Wysoglad's reputation.

159. Due to the malicious nature of the defamatory statements and the highly egregious conduct of Defendant Christensen detailed above, Mr. Wysoglad also demands punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant Christensen as follows:

A. Award presumed and actual damages in an amount to be determined at trial;

B. Award all costs of this suit;

C. An award of punitive damages;

D. Direct Defendant Christensen to issue a corrective statement; and

E. That the Court grant other relief as may be equitable, just and necessary.

**COUNT VII**
**PROMISSORY ESTOPPEL**
(Against All Defendants)

160. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs as if fully set forth herein.

161. Defendants made clear and unambiguous promises to Mr. Wysoglad to allow him to participate in equity value and performance bonus programs.

162. Defendants made clear and unambiguous promises to Mr. Wysoglad regarding *inter alia* the value of his Equity Interests, his ability to participate in the Equity Plans, and his employment through the point of a Qualifying Sale.

163. Defendants also made repeated assurances to Plaintiff that he was a valued member of Defendants' team and that he would receive his compensation in accordance with CARDS' representations and the applicable agreements.

164. These promises also included that Plaintiff would not be terminated in bad faith and for "Cause."

165. Defendants promises were repeatedly made prior to the start of the employment relationship and during the employment relationship, up to and including the day before he was terminated in bad faith by Defendants.

166. Plaintiff resigned from a lucrative and stable position with his previous employer and sacrificed an opportunity to vest valuable stock options and other benefits on the representations made by Defendants.

167. In detrimental reliance on Defendants' aforementioned promises and agreements, Plaintiff agreed to relocate his family to Arkansas and take the CFO position.

168. Defendants were aware of and encouraged Plaintiff's reliance.

169. In breach of the aforementioned promises and agreements, Defendants terminated Plaintiff from his employment in bad faith and failed to pay him owed and earned wages in the form of salary, severance, bonuses and Equity Interests.

170. Defendants' actions were contrary to the terms of the aforementioned agreements and promises.

171. As a direct and proximate result, Plaintiff has sustained damages of both an economic and personal nature, including but not limited to past and future lost salary, past and future lost compensation, past and future lost benefits, consequential damages, seizure of stock or instruments, forfeiture of Equity Interests and other damages.

172. Plaintiff reasonably and foreseeably relied upon Defendants' promises to his detriment. As a result, Plaintiff was damaged in an amount well in excess of $3 million and to be determined at trial.

173. Defendants should be bound by the promises they made to Plaintiff.

**WHEREFORE** Plaintiff prays for judgment against Defendants as follows:

A. Award all recoverable damages and amounts, including but not limited to, compensatory, punitive, actual and exemplary damages;

B. Award all costs of this suit; and

C. That the Court grant other relief as may be equitable, just and necessary.

**COUNT VIII**
**FRAUD**
(Against All Defendants)

174. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

175. Between March 2023 and September 5, 2023, Defendants by and through an agent or employee with actual and/or apparent authority, knowingly made false representations to Plaintiff that he would receive certain compensation, have job security and job stability, receive significant support and assistance regarding his family's relocation to Arkansas; and support from Defendants.

176. Defendants also made repeated assurances to Plaintiff that he was a valued member of Defendants' team and that he would receive his compensation in accordance with the applicable agreements.

177. These representations were continually restated before and throughout the employment relationship leading up to Plaintiff's sudden termination.

178. These representations also included that Plaintiff would not later be terminated in bad faith and under the guise of "Cause."

179. Defendants, by and through an agent or employee with actual and/or apparent authority, then and there knowingly made false representations with the intent to induce Plaintiff to rely on those representations.

180. At the time that Defendants knowingly made such false representations with the intent to induce Plaintiff to rely on the representations, Defendants had no intent to honor the promises and/or agreements made.

181. Plaintiff relied on Defendants' representations to his detriment, trusting that CARDS would deliver on its fraudulent representations.

182. As a direct and proximate result, Plaintiff has sustained damages of both an economic and personal nature, including but not limited to past and future lost salary, past and future lost compensation, past and future lost benefits, consequential damages, seizure of stock or instruments, forfeiture of Equity Interests and other damages.

**WHEREFORE**, Plaintiff prays for a judgment in his favor in excess of $50,000.00, plus costs, attorneys' fees, pre-judgment interest, and all recoverable damages and amounts, including but not limited to, compensatory, punitive, actual and exemplary damages.

**COUNT IX**
**CONVERSION**
(Against All Defendants)

183. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

184. Additionally, Plaintiff seeks relief for conversion.

185. Defendants, without authorization, wrongfully assumed control, dominion, or ownership over the Plaintiff's personal property, specifically including but not limited to owed compensation, stock and/or instruments, and Equity Interests.

186. Absent Defendants' bad faith efforts to forfeit this property, Plaintiff had at all relevant times a valid and legal right to the property.

187. Absent Defendants' bad faith efforts to forfeit this property, Plaintiff, at the time of the conversion, had an absolute and unconditional right to immediate possession of the property.

188. Plaintiff made a demand for possession of the property after they were converted, and CARDS declined to honor that demand.

189. As a result, Plaintiff has suffered damages of a personal and economic nature.

WHEREFORE, Plaintiff prays for a judgment in her favor in excess of $50,000.00, plus costs, attorneys' fees, pre-judgment interest, and all recoverable damages and amounts, including but not limited to, compensatory, punitive, actual and exemplary damages.

## COUNT X
## CIVIL RICO
(Against All Defendants)

190. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

191. Plaintiff has been harmed by Defendants based on 720 ILCS 5/33G-4, known as "Illinois Civil RICO."

192. Defendants engaged in a concerted action for the purpose of illegally withholding compensation, benefits, and other payments due to Plaintiff and unjustly terminating him from his position through racketeering activity.

193. Defendants engaged in a scheme in which they made material misstatements to induce Plaintiff to take the CFO position.

194. Defendants made material misstatements related to its intent to pay Plaintiff pursuant to its promises and agreements.

195. Defendants also materially misrepresented its intent regarding Plaintiff's career and future with Defendants.

196. Defendants engaged in a scheme to defraud Plaintiff of the benefits of his labor without paying him or providing him with material benefits pursuant to its promises and agreements.

197. Defendants repeatedly made fraudulent assurances to Plaintiff that he had a place in Defendants' organization (up to the day before their bad faith termination of Plaintiff's employment) and would not be fired in bad faith and under the guise of "Cause."

198. Defendants are considered an "enterprise" pursuant to Illinois Civil RICO.

199. An association-in-fact between Defendants was created when Defendants associated themselves in an effort of employing Plaintiff, participated in a common scheme to defraud Plaintiff, and unjustly enriched Defendants.

200. Defendants, individually and collectively, knew that they owed substantial monetary sums and benefits to Plaintiff but made arrangements to terminate his employment – waiting to terminate him the day after he had found an apartment in Arkansas.

201. Defendants collectively conspired to withhold these substantial monetary sums and benefits from Plaintiff.

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor and against the Defendants, as follows:

A. Awarding compensatory damages against Defendants jointly and severally to Plaintiff;

B. Awarding treble damages against Defendants jointly and severally to Plaintiff;

C. Awarding punitive damages against Defendants in an amount sufficient to punish them and deter others;

D. Awarding the costs of suit, attorneys' fees and prejudgment interest to Plaintiff; and,

E. Granting such further relief as it deems just and equitable.

**COUNT XI**
**FRAUDULENT MISREPRESENTATION**
(Against All Defendants)

202. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

203. Between March 2023 August 2023, as set forth herein, Defendants made multiple misrepresentations to Plaintiff, including offering him an Employment Agreement that they had no intent to fully perform, to further their scheme to better the appearance of CARDS with a well-respected CFO.

204. Defendants' representations regarding their intent to fulfill all of the terms of the Employment Agreement were untrue.

205. Defendants made these representations knowing they were untrue, or with culpable ignorance of their falsity. Defendants intended to not follow the terms of Plaintiff's Employment Agreement.

206. These representations were made by Defendants for the purpose of inducing Plaintiff to abandon his job, accept employment with Defendants, relocate to Arkansas, and accept appointment as the CFO of CARDS.

207. Plaintiff reasonably relied on Defendants' representations, believing that a prominent company, recently acquired by a preeminent private equity firm, would not make a high-profile hire without the intention of fulfilling its written promises.

208. Plaintiff was injured as a result of his reliance upon these representations, in that Plaintiff lost vested equity and severance when he left an established company to join CARDS; and suffered financial damages associated with becoming CFO of CARDS.

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor and against the Defendants, as follows:

A. Defendant be adjudicated and declared to be guilty of fraudulent misrepresentation;

B. Plaintiff be awarded compensatory damages in an appropriate amount and as allowed by law; and

C. Plaintiff be awarded punitive damages in an appropriate amount and as allowed by law; and

D. Plaintiff be granted such other and further relief as this Court deems just.

**COUNT XII**
**CIVIL CONSPIRACY**
(Against All Defendants)

209. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

210. The Defendants engaged in a conspiracy to defraud Plaintiff out of his severance, bonus, and equity pursuant to the applicable agreements by purposefully and repeatedly relaying false representations designed to induce Plaintiff to act to his detriment as described *supra.*

211. The Defendants acted in concert for the purpose of defrauding Plaintiff out of his severance, bonus, and equity pursuant to the applicable agreements and redirecting those sums into Defendant entities or entities owned and controlled by the Defendants.

212. In furtherance of the conspiracy, CHRISTENSEN, KEENAN, and MICHALIK fraudulently induced Plaintiff into leaving his job as CFO at his previous established employer and accepting what, in hindsight, were promises worth little more than the paper which they were written for the benefit of the Defendants entities or entities owned and controlled by the Defendants.

213. Defendants' conduct was willful and wanton.

**WHEREFORE**, Plaintiff prays for the entry of judgment in his favor and against Defendants as follows:

A. For compensatory damages in an amount to be proven at trial;

B. For prejudgment interest;

C. For punitive damages;

D. For such other relief as the Court deems just and appropriate.

**COUNT XIII**
**FRAUDULENT TRANSFER UNDER 740 ILCS § 160/5**
(Against All Defendants)

214. Plaintiff realleges all preceding paragraphs as though fully set forth herein.

215. The Defendants defrauded Plaintiff out of his severance, bonuses, and equity by falsely claiming his termination was "for cause."

216. But for the falsely asserted "for cause" termination, Plaintiff would have a incontrovertible right to receive, at a minimum, his severance and bonus payments, and at a maximum, his severance and bonus payments as well as the monetary benefits of his equity.

217. Plaintiff has a claim to his severance and bonus payments as well as the monetary benefits of his equity and the ownership interests therein.

218. Defendants unilaterally transferred the monetary value of Plaintiff's severance and bonus payments as well as the monetary benefits of his equity and the ownership interests therein to the Defendants with actual intent to hinder, delay, or defraud Plaintiff and/or without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Defendants intended to incur, or believed or reasonably should have believed that they would incur, debts they never intended to pay as they became due.

219. The transfers or obligations were to insiders; Defendants retained possession or control of the property transferred after the transfer; the transfer was concealed by Defendants; and Defendants, on information and belief, received no consideration for the transfers.

**WHEREFORE**, Plaintiff prays for the entry of judgment in his favor and against Defendants as follows:

A. For avoidance of the transfers to Defendants;

B. For an attachment against the amount of Plaintiff's severance, bonus, and equity interests transferred to Defendants;

C. For such other relief as the Court deems just and appropriate.

## COUNT XIV
## ILLINOIS WAGE PAYMENT AND COLLECTION ACT RETALIATION

(Against All Defendants)

220. Plaintiff incorporates the above paragraphs as though fully restated herein.

221. On several occasions in August 2023, Plaintiff complained directly to CHRISTENSEN regarding Defendants' failure to fully compensate him per their agreement – specifically as it related to the moving expenses and moving bonus.

222. By August 30, 2023, when CHRISTENSEN had made his intent to terminate Plaintiff known, Plaintiff immediately inquired about his contractual and promised bonuses, severance, and equity interests. CHRISTENSEN had stated at the time that a "severance agreement" addressing these issues would be transmitted to Wysoglad.

223. CHRISTENSEN was clearly agitated. However, CHRISTENSEN assured Plaintiff that Defendants understood his position, agreed he should be paid, and that they would somehow figure out how to pay him the amounts owed to him. Not once did CHRISTENSEN mention, let alone hint at, Plaintiff's termination arising out of conduct that would be considered "for cause" under the applicable agreement.

224. Several days later, rather than providing the promised severance agreement, Defendants issued a termination letter to Plaintiff – purportedly for cause.

225. Had Plaintiff not complained about Defendants' failure to fully compensate him per their agreement, and had Plaintiff not brought a lawyer in to assert his rights, Defendants would not have terminated Plaintiff.

226. Defendants terminated Plaintiff to punish him for complaining about Defendants' alleged violations of the IWPCA.

227. Defendants terminated Plaintiff in part to dissuade other employees and/or former employees from complaining against the Defendants alleging violations of the IWPCA or other statutory equivalents.

228. Plaintiff has and will suffer damages as a result of Defendants' actions as described in this Count, including but not limited to loss of employment, loss of compensation, loss of esteem, damage to his reputation, and loss of business relationships.

229. The aforementioned acts of the Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to chill Plaintiff's and others' rights under the IWPCA.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff and against Defendants, including:

A. Awarding Plaintiff full legal and equitable relief pursuant to 820 Ill. Comp. Stat. § 115/14(c), including but not limited to punitive damages;

B. Awarding reasonable attorneys' fees and costs incurred in filing this action, in accordance with 820 Ill. Comp. Stat. § 115/14(c); and

C. Such other and further relief as this Court deems just under the circumstances.

**JURY TRIAL DEMANDED**

Dated: October 13, 2023

Respectfully submitted,

/s/ Ethan G. Zelizer
One of Plaintiff's Attorneys

Ethan G. Zelizer (#6280096)
HR Law Counsel, LLC
29 South Webster Street
Suite 350-C, Naperville, IL 60540
ethan@hrlawcounsel.com